1
2
3
4
5
6
7
8        **IN THE UNITED STATES DISTRICT COURT**
9        **FOR THE EASTERN DISTRICT OF CALIFORNIA**
10
11   MARCELLA VASQUEZ,                    No. CIV S-08-1227-CMK
12              Plaintiff,
13        vs.                             <u>MEMORANDUM OPINION AND ORDER</u>
14   COMMISSIONER OF SOCIAL
     SECURITY,
15              Defendant.
16
     _____/
17
18          Plaintiff, who is proceeding with retained counsel, brings this action for judicial
19   review of a final decision of the Commissioner of Social Security under 42 U.S.C. § 405(g).
20   Pursuant to the written consent of all parties, this case is before the undersigned as the presiding
21   judge for all purposes, including entry of final judgment.  <u>See</u> 28 U.S.C. § 636(c).  Pending
22   before the court are plaintiff's amended motion for summary judgment (Doc. 23) and defendant's
23   cross-motion for summary judgment (Doc. 24).
24   ///
25   ///
26   ///

                                    1

# I.  PROCEDURAL HISTORY

Plaintiff applied for social security benefits on May 31, 2001.  In the application, plaintiff claims that disability began on January 22, 1996, and is caused by a combination of: "my legs, back, stomach hurts all the time; can't walk far or stand long; obese; hard breathing; constance [sic] pain in my body; vision problems."  In her motion for summary judgment, plaintiff alleges disability due to: "morbid obesity, degenerative joint disease in the back and knees, gastroesophageal reflux disease (GERD), hyperlipidemia, diabetes, chronic pain, anxiety, and depression."  Plaintiff's claim was initially denied.

First Administrative Hearing

Following denial of reconsideration, plaintiff requested an administrative hearing, which was held on October 10, 2002, before Administrative Law Judge ("ALJ") Antonio Acevedo-Torres.   In a November 12, 2002, decision, the ALJ concluded that plaintiff is not disabled based on the following relevant findings:

1.   Plaintiff has the following severe impairments: obesity/deconditioned state, hyperglycemia by report without objective evidence of associated end-organ damage, and musculoskeletal complaints likely related to her obesity;

2.   Plaintiff does not have a severe psychological impairment;

3.   Plaintiff's impairments do not meet or medically equal an impairments listed in the regulations.

4.   Plaintiff's allegations regarding limitations are not credible;

5.   Plaintiff has the residual functional capacity for light work; and

6.   Plaintiff can perform her past relevant work as a restaurant cook.

After the Appeals Council declined review on February 14, 2003, plaintiff appealed.  The parties stipulated to a voluntary remand with the following instructions:

Upon remand, the Appeals Council will remand this case to an Administrative Law Judge ("ALJ"), and direct him or her to re-evaluate the credibility of Plaintiff's subjective complaints in accordance with the regulations and Social Security Ruling ("SSR") 96-7p, and to consider the third-party evidence provided by Plaintiff's friend and niece.  The ALJ

will also be directed to consider the combined effects of Plaintiff's obesity with her other impairments in determining whether she has a listing-level impairment or combination of impairments, and determine what, if any, functional limitations resulted from Plaintiff's obesity in accordance with SSR 02-01p.

Second Administrative Hearing

A second administrative hearing was held on April 8, 2005, before the same ALJ. In a May 23, 2005, decision, the ALJ again concluded that plaintiff was not disabled based on the following relevant findings:

1.      The medical evidence establishes that plaintiff has severe obesity, osteoarthritis, diabetes mellitus, hypertension, and varicose veins;

2.      Plaintiff does not have an impairment or combination of impairments that meets or medically equals an impairment listed in the regulations;

3.      Plaintiff's testimony regarding her limitations are not credible because they are not shown to be a reasonable consequence of her medically determinable impairments;

4.      Plaintiff has the residual functional capacity to perform all work except for work involving lifting and carrying more than 10 pounds frequently or 20 pounds occasionally; and

5.      Plaintiff can perform her past relevant work as a restaurant cook and manager.

The Appeals Council declined review on January 30, 2006, and plaintiff filed a second appeal.

Once again, the parties stipulated to a remand, this time with the following instructions:

Upon remand, the Office of Disability Adjudication and Review will remand this case to a different Administrative Law Judge (ALJ) to re-evaluate the third-party statements and Plaintiff's subjective complaints in accordance with the regulations and SSR 96-7p. The ALJ will also re-evaluate Plaintiff's mental impairment. The ALJ will also develop the record as to Plaintiff's past work to determine if it constitutes past relevant work and, if so, make findings as to the physical and mental demands of the work and determine if Plaintiff can perform the work. If it is found that Plaintiff does not have past relevant work or is unable to perform her past relevant work, the ALJ will proceed to the fifth step of the sequential evaluation. Supplemental evidence from a vocational expert should be obtained.

///

In assigning the case to a new ALJ pursuant to the second stipulated remand, the Appeals

Council first noted that plaintiff had been found disabled on a subsequent application:

> The Administrative Law Judge found that based on the application filed May 31, 2001, the claimant is not disabled at any time through the date of his decision of May 23, 2005.  The claimant had filed a subsequent application on November 23, 2003.  The claimant was found disabled beginning November 1, 2003, in a determination dated June 30, 2004.  The Administrative Law Judge's decision conflicts with the determination dated June 30, 2004.  The Administrative Law Judge found that the claimant was not disabled at any time through the date of his decision without consideration of the earlier determination and without reopening the determination.  The determination dated June 30, 2004, is now more than two years in the past and cannot be reopened.  Therefore, the determination dated June 30, 2004, has become final and its finding that the claimant became disabled November 1, 2003, must be affirmed.

As to the relevant closed period between May 31, 2001, and October 31, 2003, the Appeals

Council stated as follows:

> The Administrative Law Judge's decision did not comply with the prior Court order to reevaluate the third party evidence provided by the claimant's friend and niece, therefore, the Administrative Law Judge must reevaluate the third party evidence and the claimant's subjective complaints.  The letter from the niece was apparently misplaced and was not in the record considered by the Administrative Law Judge upon remand.  A copy of the letter has been added to the record (p. 92) and should be evaluated by the Administrative Law Judge.
>
> The Administrative Law Judge indicated that he gave considerable weight to the third party questionnaire completed by the claimant's friend (pp. 197-198, 259-264).  In doing so, the Administrative Law Judge noted only the positive aspects of the statements and did not evaluate the part of the statement which dealt with the claimant's mental status.  Therefore, further consideration and evaluation of the claimant's friend's statements are warranted.
>
> The Administrative Law Judge found that the claimant's depression is not severe.  The Administrative Law Judge noted the May 31, 2004, mental status examination by Dr. Surulinathan, but did not acknowledge that Dr. Surulinathan indicated that the claimant "may be" able to perform work activities and "may be" able to complete a normal workday and "may be" able to deal with the usual stress.  In its most recent determination, the State Agency found that the claimant's depression was severe and it limited her to simple repetitive tasks with some decreased contact with the public and co-workers.  The Administrative Law Judge did not consider the State Agency determination or Dr. Surulinathan's statements.  Therefore, further evaluation of the claimant's depression is necessary.

The Administrative Law Judge found that the claimant can perform her
past work as a restaurant cook and manager.  The claimant's prior work at
her husband's restaurant was sporadic and she had special
accommodations (her husband bought her a stool to sit on while cooking).
It is questionable whether this work was substantial gainful activity.  The
claimant indicated that she did not work an 8 hour day as the restaurant
manager.  Thus, this work may not have been performed at the substantial
gainful activity level.  In addition, the Administrative Law Judge did not
make findings as to the physical and mental demands of the claimant's
past work.

Third Administrative Hearing

A third administrative hearing was held on October 25, 2007, before ALJ L. Kalei

Fong.  In a January 22, 2008, decision, the ALJ found that plaintiff was not disabled during the

closed period between May 31, 2001, and October 31, 2003, based on the following relevant

findings:

1.     Plaintiff has the following severe impairments: obesity,
       osteoarthritis, and varicose veins;

2.     Plaintiff does not have a severe mental impairment;

3.     Plaintiff does not have an impairment or combination of impairments
       which meet or medically equal an impairment listed in the regulations;

4.     During the closed period, plaintiff had the residual functional capacity to
       lift/carry 10 pounds frequently and 20 pounds occasionally, stand/sit/walk
       for 6 of 8 hours, and occasional climbing, bending, stooping, kneeling,
       crouching, and crawling; and

5.     Considering plaintiff's age, education, work experience, and residual
       functional capacity, and based on vocational expert testimony, there are
       jobs that exist in significant numbers in the national economy that plaintiff
       can perform.

After the Appeals Council denied further review on April 3, 2008, this appeal followed.

/ / /

/ / /

/ / /

/ / /

/ / /

## II.  SUMMARY OF THE EVIDENCE

The certified administrative record ("CAR") contains the following evidence, summarized chronologically below:[1]

October 8, 1999 – Plaintiff's treating physician, Dr. Z. Zarrabi, M.D., prepared a progress note.  Dr. Zarrabi notes complaints of mood swings and inability to sleep.  To the extent the progress note records objective findings on physical or mental status examination, the progress note is illegible.  It is apparent, however, that plaintiff was prescribed Mallaril in response to her complaints.

June 25, 2001 – Plaintiff submitted a daily activities questionnaire.  When asked to describe her typical day, plaintiff stated: "Get up, sit on couch, watch TV, crochet or latch hook, do laundry – put stuff in washer, then dryer."  She also stated that she has difficulty sleeping due to "my stomach, urine a lot."  She stated that she does not take any medication to sleep.  Plaintiff added that she does not need assistance with personal needs such as dressing herself because "I stay in night dresses so I don't need help."  As to meals, plaintiff stated that her son or friend prepare meals, though she does so "sometimes."  Meals consist of simple things like salads, soups, or hot dogs.  She stated she does not do any shopping because she "can't walk in stores."  As to household chores, she stated she does some laundry and vacuuming but needs assistance completing these tasks due to back and leg pain and trouble breathing.  For hobbies, plaintiff stated she does "crocheting, latch hook."  She stated that when she watches television she tends to fall asleep for several minutes at a time.  She does no reading.

As to social functioning, plaintiff stated that she only goes out for doctor appointments and to take her kids to and from school.  When she goes out she drives a car.  She stated she does not need any help traveling.  Plaintiff also stated that she stays away from people because "I get too nervous and aggeraved [sic]."  She stated she never visits with family or

---

[1]    Because this case involves a closed period between May 2001 and October 2003, the court does not focus on records after that timeframe.

1  speaks with relatives on the phone, though she gave no reasons.  Plaintiff stated that her children

2  are dependent on her to "keep clothes clean, make sure they do homework, and be clean for

3  school."  Plaintiff stated that her impairments have changed her social life because she would

4  "rather be alone or with my kids."  She added that she does not like crowds.

5  Regarding other aspects of her functioning, plaintiff stated that she has problems

6  concentrating due to forgetfulness.  She also stated that she has difficulty following instructions

7  due to an inability to concentrate and lack of patience.  Plaintiff stated that she has trouble

8  finishing tasks because of irritability, fatigue, and difficulty breathing.  Plaintiff stated that her

9  impairments keep her from working due to back and leg pain.  She stated she needs to lay down

10  most of the time.  She stated that she had to shut down her business because "no body could be

11  around me."

12  June 27, 2001 – Plaintiff's friend, George Hurtt, submitted a third-party daily

13  activities questionnaire concerning plaintiff's capabilities.  Mr. Hurtt stated that plaintiff does not

14  have regular sleeping hours and that she tires easily.  He stated that she "tires out walking," but

15  "does well" with personal hygiene.  He added that plaintiff has trouble breathing.  Mr. Hurtt

16  stated that he does the shopping for plaintiff based on a list she provides, though he added that

17  plaintiff pays her own bills and manages her own finances.  He stated that irritability is common

18  "due to pain & discomfort."  Mr. Hurtt also stated that plaintiff takes care of her two children and

19  "provides for their every need no matter how she feels."  He also stated that plaintiff "just doesn't

20  like to be around a lot of people."  He concluded by saying that he helps plaintiff with

21  "housework, grocery, yard work, run errands that healthy people normally do."

22  August 1, 2001 – A progress note prepared by Dr. Zarrabi reflects plaintiff's

23  continuing complaints of mood swings.  Plaintiff was prescribed Zoloft.

24  / / /

25  / / /

26  / / /

1        <u>August 9, 2001</u> – Laurie Weiss, Ph.D., reported on a complete psychological

2   evaluation.  Plaintiff reported the following complaints:

3            . . . She reported both physical and emotional problems.  She stated that
            she experienced pain in her back, knees, and feet.  She also stated that she had
4            a hernia.  Emotional symptoms included irritability, sleep
            disturbances, and "trouble dealing with people."  Finally, she stated that
5            she has memory problems.

6                    * * *

7            She stated that she worked as a nurse for 21 years until approximately
            1984.  She stated that she fell on the job and she broke her ankle.  Her
8            broken ankle evolved into a problem with arthritis.  She stated that
            because she could not work as a nurse because of physical problems she
9            obtained training in a one-year program to learn clerical skills.  She
            worked for a few years using these skills and then was married.  She stated
10          that she stopped working at that point because she had children and needed
            to care for them.  She went back to work in 1999.  She took over the
11          restaurant which her husband owned.  She worked as a manager,
            supervisor, supplier, and waitperson all at the same time.  She worked for
12          four to five months and then decided that it was too difficult for her to do
            because she could not stand for long periods of time or sit for long periods
13          of time.  She last worked in January of 2000.

14                   * * *

15          The claimant reported no psychiatric history.  She has never been
            hospitalized for psychiatric reasons.  She had never participated in
16          outpatient psychotherapy.  Nor has she been prescribed psychotropic
            medication.  She did report some vague symptoms of depression, stating
17          that sometimes she can't get out of bed because she feels unmotivated.  As
            stated above . . . she also reported irritability, impaired memory, and sleep
18          disturbances.

19   Dr. Weiss reported the following behavioral observations:

20          The claimant presented as an obese Caucasian woman.  She walked with a
            slow gait.  Motor behavior was normal.  Dress was casual.  She was
21          malodorous.  She was oriented and alert.  Speech was clear and articulate
            and of normal quantity.  Thought process was logical.  No bizarre ideation
22          or other signs of a thought disorder were noted.

23   As to daily activities, Dr. Weiss noted:

24          The claimant reported no significant impairment in any activity of daily
            living.  She is able to drive a car by herself.  She is able to perform light
25          household chores such as doing laundry.  She is able to cook simple meals
            for herself.  She stated that she has assistance in the area of grocery
26          shopping because she can't stand for long periods of time or get around

                                         8

1    very well because of physical limitations.  She is able to manage her own
     finances.

2

3    Dr. Weiss provided the following summary and conclusion:

4        In today's evaluation the claimant reported vague symptoms of depression
         including low motivation, irritability, sleep disturbances, and memory
5        impairment.  She in today's evaluation presented with no major
         disturbances in mood or affect.  Concentration, attention, and memory
6        skills appeared to be adequate.  Overall she did not meet the criteria for a
         clinical disorder as defined by the DSM-IV.
7

8        She was able to endure the stress of the interview process.

9        She demonstrated adequate concentration, attention, and memory skills.

10       She was able to understand, remember, and carry out simple, detailed, and
         complex instructions.

11       She was able to interact appropriately with this examiner.

12       She demonstrated the cognitive ability to manage her finances should
         funds be granted.

13

14       August 21, 2001 – James L. Martin, M.D., reported on a physical examination.

15   Plaintiff reported her chief problems to be high blood pressure and "body pains."  More

16   specifically, plaintiff told the doctor:

17       She also noted she has had "aches and pains" throughout her body but
         especially in her axial spine and knees and she feels this too is due to her
18       weight and "arthritis."  She under[went] arthroscopy years ago and
         apparently it was noted that she had some deterioration of the joint at that
19       time.  Motrin helps somewhat.  She denied buckling, clicking, or popping.
         She has not been diagnosed to have any other underlying rheumatological
20       condition.

21   On physical examination, the doctor reported:

22       In general she was an obese, well rested appearing robust female who
         appeared her stated age.  She was neatly groomed and grossly euthymic.
23       She had no obvious difficulty moving about the office and used no
         assistive devices.

24

25   / / /

26   / / /

9

The doctor added the following with respect to musculoskeletal examination:

> Cooperation was fair with no grimacing or pain vocalization. Findings were generally consistent with casual observations. Cervical and dorsolumbar spine showed full movement. The claimant was able to squat and arise from the squatting position with some difficulty. Seated sciatic tension testing was negative bilaterally. There was no obvious palpable paraspinous spasm along the axial spine.

Dr. Martin assessed: (1) obesity/deconditioned state; (2) hyperglycemia by report; (3) musculoskeletal complaints likely related to obesity; and (4) psychological problems not otherwise specified. The doctor added:

> At the conclusion of this review, the claimant was asked to verify that all of the medical allegations and physical examination items had been covered to her satisfaction and she assured this examiner that they had. This claimant's primary functional impairment appears to be related to her obesity and she would likely benefit from weight reduction as well as smoking cessation. Based on the objective findings, I would anticipate this claimant can lift no more than 20 lbs. at a time and frequently lift or carry up to 10 lbs. She can occasionally stoop and crouch. She can stand and walk, off and on, for at least six hours in an eight-hour day. She can sit for six hours in an eight-hour day. She appears to have the ability to grasp, hold and turn objects and has good use of the hands and fingers for repetitive hand and finger actions.

October 15, 2001 – An agency consultative doctor submitted a psychiatric review technique form. Though the doctor felt that there was a medically determinable mental impairment, insufficient evidence was present to satisfy any specified listed diagnostic criteria. Restrictions of daily living were noted to be mild, as were difficulties maintaining social functioning, concentration, persistence, or pace. There was insufficient evidence to establish any episodes of decompensation.

October 18, 2001 – An agency consultative doctor submitted a physical residual functional capacity assessment. The doctor opined that plaintiff could occasionally lift/carry up to 20 pounds and frequent lift/carry up to 10 pounds. Plaintiff could stand/sit/walk for six hours in an eight-hour day. Plaintiff's ability to push/pull was assessed as unlimited. Plaintiff could occasionally perform all postural tasks (climbing, stooping, etc.). No manipulative, visual,

communicative, or environmental limitations were noted.

November 30, 2001 – An agency consultative doctor submitted a second psychiatric review technique form.  The doctor's opinion was the same as that expressed on the October 15, 2001, psychiatric review technique form.

October 9, 2002 – Plaintiff's niece submitted a hand-written statement as to plaintiff's impairments.  She stated that she helps plaintiff with transportation by taking the children to school.  She also stated she assists plaintiff with grocery shopping, running errands, and doing yard work.  She stated that plaintiff cannot "move . . . around for a period of time" due "to her disability."  She added that she assists plaintiff with "bathing along with dressing."  Finally, she stated that she is "up and down" with plaintiff at night "to make sure that everything is okay."

May 25, 2004 – Dr. Martin reported on a second physical examination.  At this examination, plaintiff reported her complaints as diabetes and high blood pressure.  On physical examination, Dr. Martin's functional assessment remained the same as his assessment from August 2001.

May 31, 2004 – Agency examining psychiatrist Sanmukan Surulinathan, M.D., reported on a comprehensive psychiatric evaluation.  Plaintiff reported excessive worry about what would happen to her children "after she is gone."  Plaintiff reported no prior psychiatric hospitalization or treatment.  She reported last having worked in 2003.  As to activities of daily living, the doctor reported:

> She watches television during the day.  She stated that she cannot do her shopping as she cannot get around.  Her niece helps with the personal finance management and her niece pays the bills.  She stated that she cannot do housework as she cannot stand up for too long.  She stated that she cannot cook and she cannot stand at the stove.

/ / /

/ / /

/ / /

The doctor assessed major depressive disorder, moderate, and assigned a GAF score of 50.  The doctor added:

> Based on today's examination findings and the current situation, the problem is treatable.  There is a likelihood of recovery.  The condition may improve within 12 months.  Her treating doctor should consider adding another antidepressant medication.  It seems to appear that the Trazodone is being given only for sleep.

Dr. Surulinathan offered the following functional assessment:

> The claimant is capable of managing her funds and she is able to perform serial 3s correctly but for one error.

> The claimant has the ability to perform simple and repetitive tasks and she is able to perform serials 3s correctly but for one error.  Regarding detailed and complex tasks, the claimant has the ability to perform as she performed adequately on abstract thinking testing and proverb interpretation.

> The claimant can accept instructions from supervisors as she could from me during the mental status examination.  The claimant can interact with co-workers and the public as she could with me during the mental status examination.

> The claimant may be able to perform work activities on a consistent basis as she was consistent on the mental status examination today.

> The claimant would be able to maintain regular attendance in the workplace as she could maintain her attention on the mental status examination today.

> The claimant may be able to complete a normal workday/workweek without interruptions from a psychiatric condition as she could complete the mental status examination without interruptions from these today.

> The claimant may be able to deal with the usual stress encountered in competitive work as she could deal with the stress of the mental status examination today.

> June 16, 2004 – Agency consultative psychiatrist Charlotte Bible, M.D., submitted

a mental residual functional capacity assessment.  The doctor concluded that plaintiff was

moderately limited in ability to understand and remember detailed instructions, ability to carry

out detailed instructions, ability to maintain attention and concentration for extended periods of

time, ability to work in coordination with others, ability to complete a normal workday and

workweek, ability to interact appropriately with the general public, ability to get along with co-workers, and ability to respond appropriately to changes in the work setting.  Plaintiff was not found to be markedly limited in any area of functioning.  Dr. Bible opined that plaintiff was completely unable to function independently outside of the home.

## III.  STANDARD OF REVIEW

The court reviews the Commissioner's final decision to determine whether it is: (1) based on proper legal standards; and (2) supported by substantial evidence in the record as a whole.  See Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir. 1999).  "Substantial evidence" is more than a mere scintilla, but less than a preponderance.  See Saelee v. Chater, 94 F.3d 520, 521 (9th Cir. 1996).  It is ". . . such evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 402 (1971).  The record as a whole, including both the evidence that supports and detracts from the Commissioner's conclusion, must be considered and weighed.  See Howard v. Heckler, 782 F.2d 1484, 1487 (9th Cir. 1986); Jones v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985).  The court may not affirm the Commissioner's decision simply by isolating a specific quantum of supporting evidence.  See Hammock v. Bowen, 879 F.2d 498, 501 (9th Cir. 1989).  If substantial evidence supports the administrative findings, or if there is conflicting evidence supporting a particular finding, the finding of the Commissioner is conclusive.  See Sprague v. Bowen, 812 F.2d 1226, 1229-30 (9th Cir. 1987).  Therefore, where the evidence is susceptible to more than one rational interpretation, one of which supports the Commissioner's decision, the decision must be affirmed, see Thomas v. Barnhart, 278 F.3d 947, 954 (9th Cir. 2002), and may be set aside only if an improper legal standard was applied in weighing the evidence, see Burkhart v. Bowen, 856 F.2d 1335, 1338 (9th Cir. 1988).

/ / /

/ / /

# IV.  DISCUSSION

In her motion for summary judgment, plaintiff claims: (1) the ALJ erred in determining that her mental impairment was not severe; (2) the ALJ failed to properly evaluate the credibility of plaintiff's testimony; (3) the ALJ essentially rejected third-party lay witness evidence without providing reasons germane to each witness; (4) the ALJ failed to properly evaluate plaintiff's obesity as required by SSR 02-01p; and (5) the ALJ failed to pose to the vocational expert hypothetical questions that accurately reflected her limitations.

## A.     **Plaintiff's Mental Impairment**

Plaintiff argues that the ALJ committed various error in concluding that she did not have a severe mental impairment during the closed period.  In order to be entitled to benefits, the plaintiff must have an impairment severe enough to significantly limit the physical or mental ability to do basic work activities.  See 20 C.F.R. §§ 404.1520(c), 416.920(c).[2]  In determining whether a claimant's alleged impairment is sufficiently severe to limit the ability to work, the Commissioner must consider the combined effect of all impairments on the ability to function, without regard to whether each impairment alone would be sufficiently severe.  See Smolen v. Chater, 80 F.3d 1273, 1289-90 (9th Cir. 1996); see also 42 U.S.C. § 423(d)(2)(B); 20 C.F.R. §§ 404.1523 and 416.923.  An impairment, or combination of impairments, can only be found to be non-severe if the evidence establishes a slight abnormality that has no more than a minimal effect on an individual's ability to work.  See Social Security Ruling ("SSR") 85-28; see also Yuckert v. Bowen, 841 F.2d 303, 306 (9th Cir. 1988) (adopting SSR 85-28).  The plaintiff has the burden of establishing the severity of the impairment by providing medical evidence consisting of signs, symptoms, and laboratory findings.  See 20 C.F.R. §§ 404.1508, 416.908. The plaintiff's own

---

[2]     Basic work activities include: (1) walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting.  See 20 C.F.R. §§ 404.1521, 416.921.

statement of symptoms alone is insufficient.  See id.

As to plaintiff's claimed mental impairment, the ALJ stated:

The medical records also contain a report of August 2001 psychological evaluation during which the claimant related problems sleeping, dealing with people, memory, and irritability but no psychiatric treatment or history while the present exam indicated no major impairment in mood, affect, concentration, attention, or memory and no diagnosable disorder (Ex. 1F). . . .

With respect to evidence regarding any evidence of a mental disorder, the August 2001 psychological evaluation found no diagnosable mental disorder at that time (See, Ex. 1F).  Although the May 2004 psychiatric examination by Dr. Surilinathan and June 2004 State Agency reviewing psychiatrist found severe mental disorders, the claimant did not allege a mental disorder in her May 2001 disability application nor does the record establish a severe mental disorder during the applicable period ending in November 2003.  Likewise, the State Agency's reviewing psychiatrist found that though the claimant had a non-specific depressive disorder it did not result in more than mild functional limitations and is not severe, and the "special technique" for evaluating mental disorders is not required (See, Ex. 7F; 20 C.F.R. 416.920a(e)).

The State Agency's November 2001 assessment that the claimant's depressive disorder was non-severe is well supported by the record and given considerable weight (See, Ex. 7F).  That assessment is supported by the evidence indicating that at the time, despite some assistance, her daily activities and social functioning were no more than mildly impaired.  She took care of her children, drove her children to and from school without assistance, and otherwise engaged in a wide range of activities.  However, her statements that she was in constant pain which required her to lie down most of the time and impaired her capacity for concentration, is not credible in view of her contemporaneous statements that she was taking no (pain or other) medication (See, Ex. 5E).  Thus, the undersigned also rates any impairment in concentration, persistence, or pace as only mild in view of her ability to drive, ensure that her children had their homework done and were otherwise well taken care of, etc.  Again, any assistance from her niece or friend does not appear so significant that it supports any severe functional limitations in her mental capacity during the pertinent time period.  This conclusion is reinforced by the results of the August 2001 psychological evaluation showing the claimant had never been prescribed any psychotropic medication, was oriented and demonstrated no abnormalities of speech, thought processes, memory, concentration, or other cognitive processes (See, Ex. 1F).  Finally, the record provides neither evidence of extended period of decompensation from a mental disorder nor evidence of the "C" criteria under listing 12.04 of other mental listing.

///

1
2
3
4
5
6
7
8
9

> With respect to the medical source statement from one-time examining
> consultant S. Surulinathan, M.D., that examination and evaluation was
> conducted long after the pertinent time period at issue here, the period
> ending on November 1, 2003, or about seven months before Dr.
> Surulanathan's examination.  Thus, the physician's finding of a severe
> depressive disorder is beyond the scope of the present inquiry and there is
> no basis warranting its retroactive application.  Further, the consultant's
> assessment is tenuous at best: "The claimant <u>may be able</u> (emphasis
> added) to perform work activities on a consistent basis . . . <u>may be able</u> to
> complete a normal workday/workweek . . . <u>may be able</u> to deal with usual
> stress. . . ." (Ex. 12F/4, 5).  Though this assessment, along with the
> proffered GAF of 50, implies severe mental limitations, standing alone and
> in view of the absence of earlier, corroborating longitudinal evidence of a
> severe mental disorder the undersigned cannot use this later assessment to
> relate this level of severity retroactive to the pertinent time period at issue
> here.

10 Plaintiff argues that the ALJ's discussion of her mental impairment suffers from three flaws.

11 First, plaintiff contends that the ALJ failed to fully develop the record by retaining a medical

12 advisor to establish the onset date of plaintiff's mental impairment.  Plaintiff also argues that the

13 ALJ failed to discuss Dr. Bible's June 2004 opinion despite the Appeals Council's specific

14 instruction on remand to do so.

15                 1.     <u>Failure to Develop the Record</u>

16         In making the severity determination, the ALJ has an independent duty to fully

17 and fairly develop the record and assure that the claimant's interests are considered.  <u>See</u>

18 <u>Tonapetyan v. Halter</u>, 242 F.3d 1144, 1150 (9th Cir. 2001).  When the claimant is not

19 represented by counsel, this duty requires the ALJ to be especially diligent in seeking all relevant

20 facts.  <u>See</u> <u>id.</u>  This requires the ALJ to "scrupulously and conscientiously probe into, inquire of,

21 and explore for all the relevant facts."  <u>Cox v. Califano</u>, 587 F.2d 988, 991 (9th Cir. 1978).

22 Ambiguous evidence or the ALJ's own finding that the record is inadequate triggers this duty.

23 <u>See</u> <u>Tonapetyan</u>, 242 F.3d at 1150.  The ALJ may discharge the duty to develop the record by

24 subpoenaing the claimant's physicians, submitting questions to the claimant's physicians,

25 continuing the hearing, or keeping the record open after the hearing to allow for supplementation

26 of the record.  <u>See</u> <u>id.</u> (citing <u>Tidwell v. Apfel</u>, 161 F.3d 599, 602 (9th Cir. 1998)).

1    The court finds that there was no duty to develop the record because the evidence

2    was neither ambiguous nor inadequate on the issue of plaintiff's alleged mental impairment.  To

3    the contrary, the evidence clearly establishes that, as the ALJ concluded, plaintiff does not have a

4    severe mental impairment.  In June 2001 plaintiff submitted a daily activities questionnaire on

5    which she stated that she does not take any medication for sleep disturbance, which is a symptom

6    she reported to Dr. Zarrabi in October 1999.  In August 2001 plaintiff told Dr. Weiss that she had

7    no psychiatric history, had never been hospitalized for psychiatric reasons, and had never

8    participated in outpatient psychotherapy.  She also reported that she had never been prescribed

9    psychotropic medication and also told Dr. Weiss that she had  no significant impairment in any

10   activity of daily living.  Overall, Dr. Weiss concluded that plaintiff did not meet the criteria for a

11   clinical disorder as defined by the DSM-IV.  Likewise, separate agency consultative doctors both

12   concluded in late 2001 that the evidence was insufficient  to satisfy any specified listed

13   diagnostic criteria for a mental impairment.  In May 2004, plaintiff told Dr. Surulinathan that she

14   has never been hospitalized or treated for a psychiatric condition and had last worked in 2003.

15                    2.    Failure to discuss Dr. Bible's June 2004 Report

16                    Plaintiff argues that the ALJ failed to adhere to the Appeals Council's instruction

17   on remand to consider Dr. Bible's June 2004 report.  The court does not agree that the ALJ erred.

18   First, plaintiff overstates the remand instruction.  The ALJ was not instructed specifically to

19   address Dr. Bible's report in particular.  Rather, after observing that the prior hearing decision

20   did not mention Dr. Bible's report, the Appeals Council's instruction on remand was only that

21   ". . . further evaluation of the claimant's depression is necessary."  This the ALJ did by

22   discussing the evidence of mental impairment during the closed period and concluding that no

23   such severe impairment existed during that period.  The ALJ stated: "Although the May 2004

24   psychiatric examination by Dr. Surulinathan and June 2004 State Agency reviewing psychiatrist

25   [Dr. Bible] found severe mental disorders, the claimant did not allege a mental disorder in her

26   May 2001 disability application nor does the record establish a severe mental disorder during the

17

1  applicable period ending in November 2003".  In essence, the ALJ gave little to no weight to the

2  2004 evaluations because they did not reflect plaintiff's condition during the closed period.  The

3  court finds that the ALJ's consideration of these reports is consistent with the instructions on

4  remand.

5  **B.    Plaintiff's Credibility**

6          The Commissioner determines whether a disability applicant is credible, and the

7  court defers to the Commissioner's discretion if the Commissioner used the proper process and

8  provided proper reasons.  See Saelee v. Chater, 94 F.3d 520, 522 (9th Cir. 1996).  An explicit

9  credibility finding must be supported by specific, cogent reasons.  See Rashad v. Sullivan, 903

10  F.2d 1229, 1231 (9th Cir. 1990).  General findings are insufficient.  See Lester v. Chater, 81 F.3d

11  821, 834 (9th Cir. 1995).  Rather, the Commissioner must identify what testimony is not credible

12  and what evidence undermines the testimony.  See id.  Moreover, unless there is affirmative

13  evidence in the record of malingering, the Commissioner's reasons for rejecting testimony as not

14  credible must be "clear and convincing."  See id.; see also Carmickle v. Commissioner, 533 F.3d

15  1155, 1160 (9th Cir. 2008) (citing Lingenfelter v Astrue, 504 F.3d 1028, 1936 (9th Cir. 2007),

16  and Gregor v. Barnhart, 464 F.3d 968, 972 (9th Cir. 2006)).

17          If there is objective medical evidence of an underlying impairment, the

18  Commissioner may not discredit a claimant's testimony as to the severity of symptoms merely

19  because they are unsupported by objective medical evidence.  See Bunnell v. Sullivan, 947 F.2d

20  341, 347-48 (9th Cir. 1991) (en banc).  As the Ninth Circuit explained in Smolen v. Chater:

21              The claimant need not produce objective medical evidence of the
            [symptom] itself, or the severity thereof.  Nor must the claimant produce
22          objective medical evidence of the causal relationship between the
            medically determinable impairment and the symptom.  By requiring that
23          the medical impairment "could reasonably be expected to produce" pain or
            another symptom, the Cotton test requires only that the causal relationship
24          be a reasonable inference, not a medically proven phenomenon.

25          80 F.3d 1273, 1282 (9th Cir. 1996) (referring to the test established in
            Cotton v. Bowen, 799 F.2d 1403 (9th Cir. 1986)).

26

1    The Commissioner may, however, consider the nature of the symptoms alleged,

2    including aggravating factors, medication, treatment, and functional restrictions.  See Bunnell,

3    947 F.2d at 345-47.  In weighing credibility, the Commissioner may also consider: (1) the

4    claimant's reputation for truthfulness, prior inconsistent statements, or other inconsistent

5    testimony; (2) unexplained or inadequately explained failure to seek treatment or to follow a

6    prescribed course of treatment; (3) the claimant's daily activities; (4) work records; and

7    (5) physician and third-party testimony about the nature, severity, and effect of symptoms.  See

8    Smolen, 80 F.3d at 1284 (citations omitted).  It is also appropriate to consider whether the

9    claimant cooperated during physical examinations or provided conflicting statements concerning

10   drug and/or alcohol use.  See Thomas v. Barnhart, 278 F.3d 947, 958-59 (9th Cir. 2002).  If the

11   claimant testifies as to symptoms greater than would normally be produced by a given

12   impairment, the ALJ may disbelieve that testimony provided specific findings are made.  See

13   Carmickle, 533 F.3d at 1161 (citing Swenson v. Sullivan, 876 F.2d 683, 687 (9th Cir. 1989)).

14   Regarding plaintiff's credibility, the ALJ stated:

15   After considering the evidence of record, the undersigned finds that the
     claimant's medically determinable impairments could reasonably be
16   expected to produce the alleged symptoms, but that the claimant's
     statements concerning the intensity, persistence, and limiting effects of
17   these symptoms are not entirely credible.

18   The claimant's testimony that during the applicable period she had to stop
     working due to pain and could not perform housework, couldn't
19   concentrate, slept a lot due to her impairments, and that she otherwise
     could not perform at least a wide range of "light" exertion within the
20   limitations found here, is inconsistent with the record.  As noted in the
     above medical summary, the objective medical findings were quite
21   minimal by the examining medical sources.  Motor functioning, reflexes,
     grip, and sensation were normal and there was no evidence of muscle
22   atrophy or asymmetry and the medical source statements consistently were
     that she remained capable of performing light exertional work activity.
23   While she testified she was presently taking Vicodin for pain as noted, the
     record indicates that she stated during the various examinations during the
24   earlier period that she was not taking any pain or other medications, which
     thereby undermines her assertions of severe pain causing her to quit
25   working.  The undersigned accords significant weight to the medical
     source statements from the August 2001 consulting examining medical
26   source and the October 2001 reviewing State Agency medical source,

whose assessments are well supported by the objective medical findings such as the claimant's difficulty squatting and arising, left knee crepitus and effusion and evidence of previous knee surgery, as well as her marked obesity (see, Exs. 3F, 6F). Even the subsequent medical source statements found a similar level of functional capacity (Exs. 11F, 13F). Indeed, aside from the significant mental imitations found during the subsequent period (when she was found to be disabled), the record contains no contrary medical source statements.

Thus, the ALJ rejected plaintiff's testimony as not credible for the following reasons: (1) the objective findings are consistent with the ability to perform light work; and (2) her various statements are inconsistent. Plaintiff argues that her testimony should be credited as a matter of law. She also argues that, because she would be considered disabled if her testimony was credited, the court should remand with instructions to award benefits for the closed period.

Here, as defendant notes, the inconsistency among plaintiff's various statements concerning medication was alone a sufficient basis to reject plaintiff's testimony. The record supports the ALJ's conclusion that plaintiff's statements were inconsistent. Contrary to various statements plaintiff made indicating she was taking medication, a June 20, 2001, letter from a doctor who performed a cardiac evaluation reflects that, at that time, plaintiff was "on no medications." On her May 2001 application for benefits plaintiff stated that she was not taking any medications. The ALJ was correct in stating that these inconsistencies undermine plaintiff's credibility.

The ALJ noted that the inconsistencies regarding medication call into question the severity of plaintiff's pain as the reason she stopped working. The court agrees. In addition, other inconsistencies on this issue are reflected in the record. Plaintiff stated in her application for benefits that she became unable to work in January 1996. However, she told Dr. Weiss that she worked in 1999 "for four to five months and then decided that it was too difficult a job for her to do because she could not stand for long periods of time or sit for long periods of time." She told Dr. Surulinathan in May 2004 that she last worked in 2003. Thus, contrary to the statement made on her application, it appears that plaintiff was in fact working after 1996. To

1    the extent plaintiff stopped working in 1996, it does not appear the reason was disability.  And,

2    based on her statement to Dr. Surulinathan that she worked in 2003, it appears that plaintiff was

3    capable of work activity during the closed period (i.e., May 2001 through October 2003).

4        **C.**    <u>**Lay Witness Evidence**</u>

5        In determining whether a claimant is disabled, an ALJ generally must consider lay

6    witness testimony.  See <u>Dodrill v. Shalala</u>, 12 F.3d 915, 919 (9th Cir. 1993); 20 C.F.R. §§

7    404.1513(d)(4) & (e), 416.913(d)(4) & (e).  Indeed, "lay testimony as to a claimant's symptoms

8    or how an impairment affects ability to work is competent evidence . . . and therefore cannot be

9    disregarded without comment."  See <u>Nguyen v. Chater</u>, 100 F.3d 1462, 1467 (9th Cir. 1996).

10   Consequently, "[i]f the ALJ wishes to discount the testimony of lay witnesses, he must give

11   reasons that are germane to each witness."  <u>Dodrill</u>, 12 F.3d at 919.

12       As to the lay statements provided by plaintiff's niece, the ALJ stated:

13       . . . The undersigned has carefully considered the statements from the
14   claimant's niece, dated October 9, 2002, which indicates that she was
     assisting the claimant with transportation, housework, shopping, bathing,
     and dressing.  Her niece also indicates that the claimant's "disability"
15   prevented her from moving or standing for a period of time (Ex. 9E).
     Although the claimant may have received some assistance as indicated the
16   record also indicates she remained quite functional while driving and
     caring for three primary school age children, doing the laundry, crocheting,
17   preparing meals, vacuuming, etc.  Further, the claimant's prehearing
     statement also indicates she was taking no medications, which along with
18   her general lack of significant medical treatment demonstrates the minimal
     nature of her impairments at the time (See, Ex. 5E).

19                   * * *

20
21       . . . The October 2002 third party statement from the claimant's niece does
     not appear to indicate the presence of any underlying mental deficits which
     the niece has observed or otherwise commented upon (Ex. 9E).
22

23   As to statements from plaintiff's friend George Hurtt, the ALJ stated:

24       . . .George Hurtt's third party statement . . . from June 2001 indicates that
     he provided some assistant to the claimant in meal preparation, shopping,
25   but also noted that the claimant did not require assistance when leaving her
     home, drove, and provided for her children's "every need no matter how
26   she feels" (Ex. 3E/4).  These statements show that the claimant may have

received some assistance but that overall she remained quite independent and functional and capable of performing substantial gainful activity consistent with light exertional work activity within the limitations found here.

* * *

The undersigned has also carefully considered the third party statement implications of mental severity, e.g., George Hurtt's June 2001 statement that the claimant was somewhat isolated and irritable – which he attributed to the claimant's ". . . pain and discomfort. . ." rather than any mental disorder (See, Ex. 3E/4).

Plaintiff argues:

Even though the ALJ purported to credit these third party statements, he perversely used this evidence to validate his findings that Ms. Vasquez was capable of performing substantial gainful activity. On the contrary, the third party evidence corroborated Ms. Vasquez's testimony and further documented her restricted lifestyle. In essence, the ALJ rejected this credible third party evidence without articulating legitimate and germane reasons for doing so. . . .

As to Mr. Hurtt's statements in particular, plaintiff contends that "[t]he ALJ's mischaracterization of Mr. Hurtt's statements failed to convey the extent of his help or the depth of Ms. Vasquez's functional limitations."

1.   Plaintiff's Niece

Plaintiff's niece stated in October 2002 that she helps plaintiff with transportation by taking the children to school. She also stated she assists plaintiff with grocery shopping, running errands, and doing yard work. She stated that plaintiff cannot "move . . . around for a period of time" due "to her disability." She added that she assists plaintiff with "bathing along with dressing." Finally, she stated that she is "up and down" with plaintiff at night "to make sure that everything is okay." This summary is consistent with the summary outlined by the ALJ and does not appear to mischaracterize plaintiff's niece's statement. The court agrees with the ALJ's conclusion that the statement does not indicate the presence of any underlying severe impairment. While plaintiff's niece stated that she helped plaintiff with dressing and bathing, and that plaintiff could not move around "for a period of time," these statements are consistent

1   with only a mild impairment.  In other words, because plaintiff's niece's statement was

2   consistent with the ALJ's conclusion that plaintiff could perform at least light work, the ALJ did

3   not reject her statement.

4               2.      George Hurtt

5               Mr. Hurtt stated in June 2001 that, while plaintiff "tires out walking," she "does

6   well" with personal hygiene.  Further, while Mr. Hurtt described situations in which he assists

7   plaintiff, he also stated that plaintiff is able to take care of her children and "provides for their

8   every need no matter how she feels."  Again, the court finds no mischaracterization in the ALJ's

9   summary of Mr. Hurtt's statement, which is consistent with the foregoing.  Nor does the court

10  finds any error with respect to the ALJ's analysis of Mr. Hurtt's statement.  As with the statement

11  provided by plaintiff's niece, Mr. Hurtt's statement describes a person who, while needing some

12  assistance with various tasks, is not disabled.  As the ALJ noted, the person Mr. Hurtt's describes

13  is largely independent and functional.

14      **D.      Obesity**

15              In 1999, obesity was removed from the Listing of Impairments.[3]  Obesity may still

16  enter into a multiple impairment analysis, but "only by dint of its impact upon the claimant's

17  musculoskeletal, respiratory, or cardiovascular system."  Celaya v. Halter, 332 F.3d 1177, 1181

18  n.1 (9th Cir. 2003).  Thus, as part of his duty to develop the record, the ALJ is required to

19  consider obesity in a multiple impairment analysis, but only where it is "clear from the record

20  that [the plaintiff's] obesity . . . could exacerbate her reported illnesses."  Id. at 1182; see also

21  Burch v. Barnhart, 400 F.3d 676, 682 (9th Cir. 2005) (distinguishing Celaya and concluding that

22  a multiple impairment analysis is not required where "the medical record is silent as to whether

23  and how claimant's obesity might have exacerbated her condition" and "the claimant did not

24

25          [3]      Under SSR 02-01p, a person with body mass index ("BMI") of 30 or above is
    considered obese.  BMI is the ratio of an individual's weight in kilograms to the square of height
26  in meters (weight divided by square of height).

23

present any testimony or other evidence . . . that her obesity impaired her ability to work"). Where a multiple impairment analysis is not required, the ALJ properly considers obesity by acknowledging the plaintiff's weight in making determinations throughout the sequential analysis.  See Burch, 400 F.3d at 684.

As to plaintiff's obesity, the ALJ noted:

The medical records show the claimant underwent general medical treatment for obesity, upper respiratory infections, gastric distress, and other complaints during the 1980s and following years from Dr. Zarrabi. Her June 2001 weight was recorded at over 350 pounds and in August 2001 she complained of back and leg pain and mood swings and elevated blood sugar for which she was prescribed oral medication for diabetes. She continued to demonstrate marked obesity and elevated glucose requiring increasing medication.  Dr. Zarrabi's final progress record of February 2004 reported her weight at 315 pounds.  She also complained of knee and back pain but no other significant abnormalities were recorded and she was to take Motrin and see mental health (Ex. 9F).

* * *

. . . Consulting internal medicine exam [from August 2001]. . . noted her obesity and deconditioning but no problems moving about except for difficulty arising.  Otherwise, there was normal gait, heel and toe walk, motor function, sensation, strength, and range of joint motion and no apparent paraspinal muscle spasm.  There was some crepitus and small effusion of the left knee.  She was considered limited mainly by obesity and would benefit from weight loss and smoking cessation and she was capable of standing/walking at least 6 of 8 hours and lifting and carrying from 10 pounds frequently to 20 pounds occasionally (Ex. 3F). . . .May 2004 consultative exam revealed varicose veins, ankle swelling, and slightly restricted lumbar spine motion.  She limped and walked on her heels and toes with difficulty though motor functioning, grip, reflexes, and blood pressure were normal and the assessment again was that her obesity and deconditioning were the primary impairment while degenerative arthritis was suspected and she was again found capable of standing/walking 6 of 8 hours and lifting 10 to 20 pounds (Ex. 11F).

Plaintiff argues:

The ALJ perfunctorily listed Ms. Vasquez's obesity as a "severe" impairment but completely ignored the significance of this impairment on her ability to function in a sustained manner.  Most galling, despite repeated references in the record to Ms. Vasquez's morbid obesity, the ALJ failed to follow Social Security's own rules regarding the analysis of this impairment.

1 | Specifically, plaintiff contends that the ALJ failed to conduct a multiple impairment analysis as

2 | required by SSR 02-01p.  Defendant argues that, to the contrary, the ALJ's functional capacity

3 | assessment accounted for her obesity in that the ALJ did not outline any functional abilities

4 | which were inconsistent with limitations resulting from plaintiff's obesity.  In other words, "[t]he

5 | ALJ's analysis accounted for any functional limitations arising from plaintiff's obesity."

6 | The court agrees with defendant.  Here, there is evidence that obesity exacerbates

7 | plaintiff's condition.  Several of her doctors have opined that plaintiff's weight and

8 | deconditioning is a problem for her that contributes to her musculoskeletal complaints.  Given

9 | this evidence, the regulations require the ALJ to consider obesity as part of a multiple

10 | impairment analysis.  The ALJ did just this by finding that plaintiff has the residual functional

11 | capacity to perform the full range of light work, which does not involve physical demands any

12 | doctor has opined is precluded by plaintiff's weight.  This finding is consistent with the medical

13 | opinion evidence of record which indicates that, while acknowledging plaintiff's obesity, the

14 | doctors who evaluated plaintiff concluded that she can nonetheless perform light work.

15 | **E.   Hypothetical Questions**

16 | Hypothetical questions posed to a vocational expert must set out all the

17 | substantial, supported limitations and restrictions of the particular claimant.  See Magallanes v.

18 | Bowen, 881 F.2d 747, 756 (9th Cir. 1989).  If a hypothetical does not reflect all the claimant's

19 | limitations, the expert's testimony as to jobs in the national economy the claimant can perform

20 | has no evidentiary value.  See DeLorme v. Sullivan, 924 F.2d 841, 850 (9th Cir. 1991).  While

21 | the ALJ may pose to the expert a range of hypothetical questions based on alternate

22 | interpretations of the evidence, the hypothetical that ultimately serves as the basis for the ALJ's

23 | determination must be supported by substantial evidence in the record as a whole.  See Embrey v.

24 | Bowen, 849 F.2d 418, 422-23 (9th Cir. 1988).

25 | / / /

26 | / / /

1    Plaintiff argues that, in expressing plaintiff's residual functional capacity in

2  hypothetical questions posed to the vocational expert, the ALJ: (1) failed to include Dr. Martin's

3  opinion that plaintiff would be limited to "off and on" walking/standing; (2) failed to include Dr.

4  Surulinathan's opinion that plaintiff had a serious mental impairment with an associated GAF

5  score of 50; (3) failed to include Dr. Bible's opinion that plaintiff is moderately impaired in

6  various areas of functioning; and (4) failed to include limitations to which plaintiff and lay

7  witnesses testified, specifically plaintiff's need for a daily one-hour nap.  Plaintiff argues:

8            Under Embrey, all these limitations should have been included in
         the hypothetical questions posed to the VE.  Indeed, when the ALJ
9        included Ms. Vasquez's need for a daily one-hour nap, the VE testified
         that "the laying down and resting is going to make it real difficult, not
10       impossible, but it probably would erode the labor market probably
         significantly."  TR 450.  In addition, when the Representative posed a
11       hypothetical based on the mental limitations assessed by Dr. Bible, the VE
         testified "Well, I think that there would be too many moderates which
12       would erode all of the labor market."  TR 451.  Nevertheless, the ALJ
         found that she could perform a significant number of light jobs citing the
13       VE's testimony.

14  Plaintiff concludes that, had the ALJ properly credited the medical evidence and testimony, an

15  accurate hypothetical question would have resulted in a determination that plaintiff is disabled.

16           As outlined above, the case law requires that the ALJ include in hypothetical

17  questions all "substantial, supported limitations and restrictions."  See Magallanes, 881 F.2d at

18  756.  Thus, alleged limitations and/or restrictions which are not substantial or supported by the

19  objective evidence need not be considered.  As to Dr. Martin's opinion from August 2001 that

20  plaintiff could stand/walk "off and on" for six hours in an eight-hour day, the court finds that "off

21  and on" does not refer to a substantial or supported discreet limitation.  Rather, the phrase

22  appears to account for normal breaks from continuous standing/walking during the work day.  No

23  other doctor opined that plaintiff required any kind of significant rest interval and, thus, it was

24  reasonable for the ALJ to also conclude that "off and on" did not refer to any specific limitation

25  other than normal rest period.   Similarly, plaintiff's contention that she requires daily one-hour

26  naps is not supported by the objective evidence of record and, for the reasons discussed above,

the ALJ properly rejected plaintiff's testimony as not credible.

As to Dr. Surulinathan's May 2004 GAF assessment and statement that plaintiff has a severe mental impairment, that opinion is outside the relevant closed period ending October 31, 2003.  In other words, while plaintiff may have had a severe mental impairment by May 2004, this is not to say that such impairment existed before October 31, 2003.  Indeed, none of the objective medical evidence of records indicates the existence of any severe mental impairment during the closed period.  Moreover, Dr. Surilanathan's ultimate conclusion as to plaintiff's mental functional capacity is entirely consistent with the ALJ's conclusion that plaintiff can perform light work.  As with Dr. Surilanathan's opinion, Dr. Bible's June 2004 assessment is not probative as it reflects plaintiff's condition outside the closed period.

## V.  CONCLUSION

Based on the foregoing, the court concludes that the Commissioner's final decision is based on substantial evidence and proper legal analysis.  Accordingly, IT IS HEREBY ORDERED that:

1.      Plaintiff's amended motion for summary judgment (Doc. 23) is denied;

2.      Defendant's cross-motion for summary judgment (Doc. 24) is granted; and

3.      The Clerk of the Court is directed to enter judgment and close this file.


DATED:  September 29, 2010

_____
**CRAIG M. KELLISON**
UNITED STATES MAGISTRATE JUDGE